# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# JACKSONVILLE DIVISION

ALEX LEE CAMPBELL,

                        Petitioner,

vs.                                          Case No.:    3:12-cv-905-J-34MCR
                                                          3:09-cr-51-J-34MCR-2

UNITED STATES OF AMERICA,

                        Respondent.
_____/

## REPORT AND RECOMMENDATION[1]

Before the Court is Petitioner Alex Lee Campbell's ("Alex's") Motion to Vacate

Under 28 U.S.C. § 2255 (Doc. 1)[2], in which Alex claims that his trial counsel, Roland

Falcon, rendered ineffective assistance in connection with a motion to suppress in the

underlying federal criminal case.  Alex contends that his attorney's failure to establish

his expectation of privacy in two houses where police officers unlawfully seized certain

---

[1]     A party may file specific written objections to proposed findings and a recommended disposition within 14 days of service of a magistrate judge's report and recommendation. Fed. R. Civ. P. 72(b)(2); Rule 12 of the Rules Governing Section 2255 Proceedings; see also Fed. R. Civ. P. 6(d) (adding three days after period would otherwise expire if party must act within a specified period after service and service is made by electronic filing as provided by Fed. R. Civ. P. 5(b)(2)(E)).  The district judge must "make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made.  [She] may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge.  The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions." 28 U.S.C. § 636(b)(1); accord Fed. R. Civ. P. 72(b)(3).  However, a district judge need not consider frivolous, conclusory, or general objections.  Marsden v. Moore, 847 F.2d 1536, 1548 (11th Cir. 1988).  A party's failure to specifically object in writing may alter the scope of appellate review.  See Fed. R. Civ. P. 72(b)(3); Dupree v. Warden, 715 F.3d 1295, 1300 (11th Cir. 2013).

[2]     Citations to Alex Lee Campbell's underlying criminal case file, United States of America v. Frederick Campbell, et. al., 3:09-cr-51-J-34MCR, are denoted as "Crim. Doc. ___."  Citations to Alex Lee Campbell's civil § 2255 case file, 3:12-cv-905-J-34MCR, are denoted as "Doc. ___."  Because Alex's brother and codefendant, Fredrick Campbell, also filed a § 2255 motion that incorporates documents relevant to Alex's case, citations to the record in Fredrick's civil § 2255 case file, 3:12-cv-881-J-34MCR, are denoted as "Fredrick Doc. ___."  I also observe that Fredrick's name is spelled differently in the criminal and civil cases, but because his name is spelled as "Fredrick" rather than "Frederick" in the civil filings, I use the former.

papers was unreasonable.  Alex further contends that such a failure prejudiced him, because it failed to prevent the admission of evidence which showed that he was part of a conspiracy to traffic more than 1,000 kilograms of marijuana.  This is the only issue raised in Alex's Motion to Vacate.

The Honorable Marcia Morales Howard granted Alex's request for an evidentiary hearing and, under 28 U.S.C. § 636(b) and Rule 8 of the Rules Governing Section 2255 Proceedings, referred the cause to the undersigned to appoint counsel to represent Mr. Campbell, conduct the hearing, propose factual findings, and recommend a disposition consistent with <u>Kimmelman v. Morrison</u>, 477 U.S. 365 (1986).  (Doc. 19 at 10). Consistent with <u>Kimmelman</u>, I examined:

(1) whether Alex had a meritorious Fourth Amendment claim;

(2) whether trial counsel's performance was deficient in relation to Alex's motion to suppress; and

(3) whether there is a reasonable probability that the verdict would have been different absent the excludable evidence.

<u>See</u> <u>Kimmelman</u>, 477 U.S. at 375, 382.

I appointed Shawn Arnold, Esq., to represent Alex (Doc. 20), and conducted the hearing on February 2, 2015, at which Alex Campbell, Roland Falcon, and six other witnesses testified, including two of Alex's brothers, Fredrick Campbell ("Fredrick") and Jerry Campbell ("Jerry"); Alex's mother, Sonia Antoinette Dodd; and three of Alex's friends, Temario Wiley, Brandon Reddick, and Charika Pugh.  I admitted without objection Government's Exhibit 1.  I also admitted without objection Defendant's Exhibits 1 through 8.

Alex focused his case on the first two prongs of the <u>Kimmelman</u> analysis, i.e. whether Alex had a meritorious Fourth Amendment argument, and whether counsel's performance was deficient.  The government focused its case on showing that counsel's performance was not deficient, but part of a coordinated trial strategy.  Neither party provided substantial argument regarding whether Alex's verdict would have been different absent the excludable evidence.  The undersigned is prepared to agree that Alex had a <u>partially</u> meritorious Fourth Amendment claim in the underlying case.  However, finding Alex's and his witnesses' testimony inconsistent, and finding Falcon's testimony credible, the undersigned concludes that counsel's performance was informed by strategic considerations and was not objectively unreasonable.  The undersigned further concludes that even if counsel had successfully moved to suppress evidence in the manner Alex insists he should have, not all of the evidence would have been suppressed.  As a result, the verdict and the sentence would not have been different.  Finding that Alex has not demonstrated deficient performance or prejudice, I recommend denying Alex's § 2255 motion.

## I.    Background

### A.  The Criminal Investigation

Police officers began investigating Alex's brother, Fredrick, in 2008 when a confidential informant notified the Jacksonville Sheriff's Office (JSO) that Fredrick was receiving large shipments of marijuana from California through Federal Express (FedEx) and United Parcel Service (UPS).  (Report and Recommendation on Motion to Suppress, Crim. Doc. 147 at 2; Suppression Transcript, Crim. Doc. 135 at 10).  JSO identified several addresses connected to Fredrick, and then requested FedEx and UPS

to "flag" those addresses.  Among the flagged addresses was a residence located at 7635 Praver Drive East, Jacksonville, Florida (the "Praver house").

On January 8, 2009, a UPS employee notified JSO of a large package from Los Angeles, California, which was destined for the Praver house and addressed to one "Maureen Lawrence." (Narcotics Unit Incident Report, Fredrick Doc. 25 at 37; Crim. Doc. 147 at 3-4; Crim. Doc. 135 at 19).  Acting on his own, the UPS employee opened the package and discovered what he believed to be marijuana.  (Crim. Doc. 147 at 3). JSO officers arrived at the UPS office 20 to 30 minutes later, where they observed the drugs sitting in plain view.  (See id.)  An officer trained to detect narcotics readily identified the substance as marijuana.  (Id.)  The UPS employee then resealed the package, (id. at 7), and the officers took the parcel so they could execute a controlled delivery once they received a search warrant, (id. at 4).  Later that same day, the officers did in fact obtain a warrant authorizing them to search the Praver house for marijuana.  (See id. at 4, 8).

With the warrant in hand, law enforcement officers proceeded to the Praver residence with the package.  An officer in plain clothes delivered it to Fredrick at approximately 5:50 pm in the evening.  (Fredrick Doc. 25 at 37).   When Fredrick received the package, he suggested that it belonged to a sibling.  (Crim. Doc. 147 at 16).  Nevertheless, Fredrick took the package and returned inside the house.  (See id. at 8, 16).

Shortly after Fredrick accepted the package, six or seven police officers approached the house to execute the search warrant.  As they did so, the officers noticed the occupants running toward the garage.  (Id. at 8).  The officers therefore

forcibly entered the home and headed for the garage as well.  There they found Alex in the driver's seat of a black Chevrolet Malibu, attempting to back the car out while Fredrick was trying to get in on the passenger's side.  (Suppression Hearing Transcript, Crim. Doc. 135 at 116-17).  The officers apprehended Alex and Fredrick while they searched the vehicle and the remainder of the house.  In the backseat of the car, the officers located the UPS package, plus another package containing 50 pounds of marijuana.  (Id. at 115).  Elsewhere in the house, officers found four firearms laying out in plain view, including an assault rifle with a 100-round magazine.  (Crim. Doc. 147 at 9).  The officers also discovered a laptop with an open screen displaying a UPS tracking number, a money counter, a lease agreement naming Alex as lessee of the Praver house, storage unit rental agreements, and other lease agreements.  (Id.)  Officers picked up and examined several of these documents, which led them to obtain search warrants for a house at 4708 Trevi Drive in Jacksonville, Florida (the "Trevi house"), and one Storage Unit 226 at Atlantic Self-Storage.  (Id. at 9-10).

The police placed Alex and his brother, Fredrick, under arrest.  A search of Alex incident to his arrest revealed 95 grams of marijuana, (Crim. Doc. 135 at 179; Crim. Doc. 350 at 55), as well as several shipping receipts, (Crim. Doc. 135 at 132-33).  One of the documents was a torn shipping label, and the other four were receipts reflecting shipments weighing 61 pounds, 59.7 pounds, 60.2 pounds, and 50.8 pounds.  (See Crim. Doc. 214 at 4; Crim. Doc. 341 at 67-73) (admitting label and receipts seized from Alex's pocket as Government's Exhibits 14A through 14E).  Each shipment was headed for an address connected with Alex Campbell.  (See Crim. Doc. 341 at 69).

Following the arrest, police officers tried to ascertain where Alex lived, a task complicated by the fact that Alex was associated with numerous addresses.[3]  Alex invoked the right to counsel sometime after his arrest, so police officers did not question him after that point.  (Fredrick Doc. 25 at 38).  It is unclear if Alex spoke to the officers before being taken to the police station, but officers recorded an address for Alex that was the same one listed on his driver's license, which then was a residence on San Jose Manor Drive in Jacksonville, Florida.  (Doc. 49 at 45, 209; see also Crim. Doc. 135 at 147, 150, 193-94).  At that time, Alex did not give the Praver residence as his home address.  (Crim. Doc. 147 at 11).

Based on documents examined at the Praver house, police officers obtained a warrant to search Storage Unit 226 and the Trevi house.  In Storage Unit 226, officers discovered a safe and food saver containing currency, Alex's birth certificate, mail addressed to Alex, money gram receipts, and another receipt in the name of Sonia Dodd.  (See Crim. Doc. 214, Government's Exhibit List at 5-6).  Storage Unit 226 contained more than $500,000 in cash.  Meanwhile, a search of the Trevi residence uncovered items related to shipping, including money grams, hotel receipts, car rental and airline documents, storage unit rental agreements, and notes containing addresses, phone numbers and tracking numbers.  (Crim. Doc. 147 at 10).  One of the rental

---

[3]      Although the police arrested Alex at Praver Drive, his driver's license reflected that his home address was 4711 San Jose Manor Drive, Apartment Number 4, Jacksonville, Florida.  (Doc. 49 at 45, 209).  The UPS receipts seized from Alex's pockets were destined for other residences on Ponce de Leon Avenue, Silent Brook Trail, and Cedar Drive, Jacksonville, Florida.  (Crim. Doc. 350 at 69-70; see also Crim. Doc. 214 at 4).  Furthermore, there were utility records connecting Alex to a house on Trevi Drive, (see Doc. 49 at 42-43), and another house at 7910 Napo Drive, Jacksonville, Florida, (see id. at 42-43, 44, 48-49).  Alex himself states that he refused to tell police officers where he lived.  (Doc. 14 at 2).
As the magistrate judge noted in Alex's detention order, "the United States offered evidence of [Alex] renting a number of different residences and using various addresses for other purposes, suggesting [Alex] does not have a stable residence."  (Detention Order, Crim. Doc. 89-2 at 2).

agreements seized from the Trevi house led police to obtain a further search warrant for another storage unit, Unit 2002 at Atlantic Self-Storage.  A search of Unit 2002 uncovered an AK-47-style assault rifle and boxes of shipping receipts connected to shipments weighing, in total, more than 2,000 pounds.  (See id.; see also Fredrick Doc. 25 at 39-40).

On September 10, 2009, a grand jury sitting in the Middle District of Florida returned a superseding indictment charging Alex, his brother Fredrick, his sister Branddie, and his mother Sonia Dodd with conspiracy to possess with intent to distribute 1,000 kilograms or more of marijuana, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), and 846 (Count One).  (Crim. Doc.142, Superseding Indictment).   The indictment also charged Alex and his brother Fredrick with possessing, causing to be possessed, and aiding and abetting in the possession of marijuana with the intent to distribute, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C), and 18 U.S.C. § 2 (Count Two).  The indictment further charged Alex and his brother with possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A) (Count Four naming Alex Campbell).

### B.  The Motion to Suppress

Alex's trial counsel, Roland Falcon, moved to suppress any evidence resulting from the UPS employee's initial search of the parcel from California.  (Crim. Doc. 111, Motion to Suppress at 1-2).  Falcon's theory was that the UPS employee acted as an agent for the government when he searched the package – allegedly at JSO's direction – without probable cause.  Although Falcon did not challenge the searches of any of the houses or storage units on their own, he did argue that any evidence discovered after

the UPS employee's search of the parcel was fruit of a poisonous tree, and therefore should be suppressed as well.  (Id.)

On August 12, 2009, a magistrate judge conducted an evidentiary hearing on Alex's and his co-defendants' motions to suppress.  The defendants did not present any of their own witnesses at the hearing.  Instead, Falcon attempted to establish Alex's expectation of privacy in the UPS package by pointing out that he was the lessee of the address to which the package was mailed.  (Crim. Doc. 135 at 211-15).  Falcon also argued that the fact that the UPS parcel was addressed to an alias did not diminish Alex's expectation of privacy in it, and pointed the Court to several cases to support his argument.  (Id. at 213-15).  Falcon reiterated his argument that if the search of the UPS package was illegal, then all the evidence gathered thereafter was fruit of a poisonous tree.  (Id. at 215-16).

After the suppression hearing, the magistrate judge issued a Report that recommended denial of Alex's motion to suppress.  (Crim. Doc. 147 at 36).  The magistrate judge found that Alex had no expectation of privacy in the UPS parcel because he had not shown a sufficient connection between himself, the package, and the alias to whom it was addressed.  (Id. at 14-15).  The magistrate judge did find that when police officers inspected various documents at the Praver and Trevi houses – which led to the officers obtaining search warrants for storage units 226 and 2002 – the officers exceeded the scope of their search warrant and acted outside the limits of the plain view doctrine.  (Id. at 28-35).  However, because Alex neither challenged the search of either house nor showed anything more than a leasehold interest in the

Praver residence, he lacked standing[4] to suppress the unlawfully examined papers.  (Id. at 17 & n.2).  The magistrate judge further concluded that because Alex lacked standing in the Praver or Trevi houses, he could not avail himself of the "fruit of the poisonous tree" doctrine to suppress evidence gathered as a result of the unlawful searches.  (See id. at 23, 31-32).  Because only Sonia Dodd could establish standing in the Trevi house, the magistrate judge recommended partially granting the motion to suppress as to her, but denying it as to Alex and his brother.  (Id. at 35-36).

In the Report, the magistrate judge alternatively concluded that even if Alex did have an expectation of privacy in the UPS parcel, the employee's act of opening the package, inspecting its contents, and notifying police about the drugs did not violate the Fourth Amendment because he acted as a private citizen rather than a government agent.  (Id. at 21-23).  Although the UPS employee had searched packages destined for "flagged" addresses and notified police of their contents several times in the past, the magistrate judge concluded that police neither instructed nor compelled the employee to open the package.  (Id. at 7).  Rather, the employee opened the package on his own initiative pursuant to UPS's internal policy against shipping contraband.  (Id. at 5-6).  Thus, because the UPS employee's search did not involve government action, the magistrate judge concluded that the employee's search did not implicate the Fourth Amendment.

Notably, the only search that the magistrate judge identified as illegal was the inspection of papers at the Praver and Trevi residences.   As mentioned, the UPS employee's search of the parcel from California, which triggered the ensuing

---

[4]     I use the term "standing" as shorthand for a legitimate expectation of privacy.

investigation, was not found to implicate the Fourth Amendment in the first instance. That inspection, in turn, led to a warrant authorizing officers to search the Praver residence for marijuana.  Pursuant to that same warrant, police officers then seized two large packages of marijuana from the backseat of the car Alex was driving, each weighing around 50 pounds.  (See Crim. Doc. 147 at 9).  In the course of searching the Praver house for marijuana, officers also discovered several firearms sitting out in plain view.  (Id. at 9, 28).  Then police arrested Alex, and a search incident to that arrest revealed shipping labels and additional ounces of marijuana.  (Id. at 11).  None of these searches was identified as unlawful, irrespective of whether Alex had standing in the Praver house.

Falcon timely objected to the Report and Recommendation (Objections, Crim. Doc. 168), but the Court overruled the objections and adopted the Report and Recommendation in full (Order Adopting R&R, Crim. Doc. 200).  After the Report came out, Alex moved to adopt his codefendants' motions to suppress (which did challenge the search of the Praver and Trevi houses) (see Crim. Doc. 194).  However, the Court denied that motion as being untimely.  (Crim. Doc. 200 at 11).

### C.  The Trial, Sentencing, and Appeal

Alex proceeded to trial with his brother Fredrick on February 9, 2010.  At trial, Alex acknowledged ownership of several of the firearms found at the Praver house. (Crim. Doc. 342 at 202-06, 208-11).  However, Alex denied any knowledge of or involvement in the marijuana conspiracy.  (Id. at 188-89, 197-98, 211).  While Alex acknowledged that he smoked marijuana, he denied dealing or distributing it.  (Id. at 198, 212).  Alex testified that in the months leading up to his arrest, he had been busy

10

going to college to study video production, (id. at 196), and running a small business called "Sho Up 'N' Sho Out Fashions," through which he sold clothes and rap CD's to college-aged students, (id. at 192-95, 225-30).  Alex specifically, and adamantly, denied that law enforcement officers found any shipping documents or labels in his pockets when he was arrested.  (Id. at 199-200, 218-20).  Meanwhile, Fredrick testified that he was the only individual in his family involved in buying and selling marijuana, and that his family members neither knew about nor participated in his drug enterprise.  (Id. at 63-64, 67, 71-73).  Fredrick also testified that the five UPS shipping labels and receipts allegedly found in Alex's pockets were actually found in his own pocket.  (Id. at 72-73).  As for the government, the prosecution relied on the marijuana discovered on Alex's person and at the Praver house, as well as UPS and FedEx shipping documents found in his pockets and various other locations, to tie Alex to the conspiracy.  In addition, there was some testimony from an associate of Alex's and Fredrick's that connected Alex to the marijuana operation.  (See Crim. Doc. 338 at 109-10, 122-23, 161).

The jury found Alex guilty of all charges listed in the superseding indictment, despite Fredrick's efforts to take responsibility for the entire enterprise.  (Crim. Doc. 259, Jury Verdict as to Fredrick Campbell; Crim. Doc. 260, Jury Verdict as to Alex Lee Campbell).  Alex's sister, Branddie, and his mother, Sonia Dodd, also pled guilty despite Fredrick's effort to claim they were not involved in the conspiracy.  (Crim. Doc. 275, Report and Recommendation on Accepting Branddie Campbell's Guilty Plea; Crim. Doc. 269, Sonia Dodd's Plea Agreement).  At the sentencing hearing, the Court found that both Alex and Fredrick deliberately gave perjured testimony.  (Sentencing Transcript, Crim. Doc. 344 at 42-44, 50-52).  The Court found that Alex lied under oath

about his ignorance of the marijuana conspiracy, and specifically lied when he denied that law enforcement officers found shipping labels and receipts in his pockets. (Id. at 50-51). Because the Court found that the false testimony was calculated to achieve a particular outcome, (id. at 51-52), the Court applied a two-offense level enhancement for obstruction of justice pursuant to U.S.S.G. § 3C1.1. Because Alex's base offense level was 32 on account of trafficking in more than 1,000 kilograms of marijuana, (Crim. Doc. 344 at 46), the enhancement yielded a total offense level of 34, (id. at 61). Alex fell into Criminal History Category I, so his advisory sentencing range under the United States Sentencing Guidelines ("Guidelines") was 151 to 188 months for the drug offense. (See id.) The Court varied below the Guidelines and sentenced Alex to a term of imprisonment of 135 months. (Id. at 96). That term was followed by a mandatory consecutive term of 60 months for possessing a firearm in furtherance of a drug crime, yielding a total term of imprisonment of 195 months. (Id.; see also Crim. Doc. 323, Judgment as to Alex Campbell).

Alex, still represented by Falcon, appealed his conviction, sentence, and the denial of his motion to suppress to the Eleventh Circuit. The court affirmed Alex's conviction and sentence along with the denial of the motion to suppress. United States v. Campbell, et al., 434 F. App'x 805 (11th Cir. 2011). In doing so, the court of appeals concluded that Alex lacked a legitimate expectation of privacy in both the UPS parcel and the Praver residence. Id. at 809-10. Rejecting Alex's claim of an expectation of privacy in the UPS parcel, the court explained that Alex was neither the sender nor the addressee on the package. Id. at 809. The court also explained that the fact that Alex leased the property to which the parcel was mailed was not enough to establish an

expectation of privacy in the package.  Id.  The court of appeals further found that Alex

waived the right to assert standing to challenge the search of the Praver house because

he did not address his expectation of privacy until after the motion-to-suppress deadline

had passed.  Id. at 810.[5]  Turning to his sentence, the court of appeals concluded there

had been no error.  Id. at 811.  The court explained:

> Based on the shipping labels and the actual marijuana recovered, the
> government sufficiently proved the drug quantity by a preponderance of
> the evidence, and the district court correctly calculated Frederick's and
> Alex's base offense levels using that drug quantity.  Accordingly, there has
> been no error, plain or otherwise, as to Frederick's or Alex's sentence.

Id.  Having rejecting Alex's remaining claims, the circuit court remanded the case in part

for this Court to correct a clerical error in the judgment, but otherwise affirmed.  Id. at

810-12.

Alex moved the Eleventh Circuit for reconsideration, which the court denied on

October 6, 2011.  Alex did not request certiorari review by the Supreme Court.  Thus,

Alex's conviction and sentence became final 90 days later upon the expiration of the

time for seeking certiorari review, see Kaufmann v. United States, 282 F.3d 1336, 1338

(11th Cir. 2002), or January 4, 2012.

## II.    Section 2255 Motion

Less than a year later, on August 9, 2012, Alex filed his pro se § 2255 Motion.

(Motion to Vacate, Doc. 1).  Because he filed it within one year of when the conviction

and sentence became final, the Motion is timely.  28 U.S.C. § 2255(f)(1).  As stated

above, Alex contends that trial counsel, Roland Falcon, provided ineffective assistance

---

[5]     The court of appeals neither addressed nor disturbed this Court's conclusion that the UPS
employee's search of the parcel was non-governmental action that did not implicate the Fourth Amendment.

in regard to his pretrial motion to suppress.  Specifically, Alex contends that Falcon rendered ineffective assistance by failing to conduct an adequate investigation, and that such inadequate investigation caused Alex not to establish his expectation of privacy in the Praver and Trevi houses (Doc. 2 at 8-9, 14), where police officers unlawfully examined certain papers.  Alex maintains that he satisfied the criteria for having an expectation of privacy in both houses.  As to Praver, Alex asserts that he was an occupant and lessee, lived and slept there daily, kept his personal possessions there, had his own room, had a key and complete access to the house, and had the right to exclude visitors from it.  (Id. at 9; see also Affidavit A-2).  As to Trevi, Alex asserts that, while it was his mother's residence, he had a key and unlimited access to the home, kept some personal possessions there, and occasionally stayed the night.  (Doc. 2 at 10; see also Affidavit A-3).  Alex contends that had counsel known of these facts, counsel would have called him and several other witnesses to testify at the suppression hearing to establish his expectation of privacy.  (Doc. 2 at 9 n.2, 13-14).

Because the papers seized from the Praver and Trevi houses enabled officers to get search warrants for other locations – locations that yielded further incriminating evidence of Alex's involvement in the conspiracy – Alex argues that counsel's failure to establish his standing in the two houses prevented him from benefiting from the "fruit of the poisonous tree" doctrine.  (See id. at 11).  As Alex explains, "[a]bsent the excludable evidence, the government's drug quantity evidence would only have supported a verdict for possession with intent to distribute less than 100 kilograms of marijuana under title 21 U.S.C. § 841(b)(1)(D) which carries a significantly lower maximum statutory penalty of five years imprisonment, far less than the 135 month sentence now imposed."  (Id.)

Thus, Alex asserts that counsel's performance regarding the motion to suppress

prejudiced him by resulting in a longer sentence than he could have otherwise received.

### III.   Proposed Findings of Fact from the Evidentiary Hearing

### A. Overview

At the evidentiary hearing, I heard testimony from Alex Lee Campbell (Doc. 49 at

15-67); Temario Wiley, (id. at 67-96); Charika Pugh, (id. at 97-109); Jerry Campbell, (id.

at 109-25); Brandon Reddick, (id. at 125-35); Sonia Dodd (Alex's mother and

codefendant), (id. at 135-53); and Fredrick Campbell (Alex's brother and codefendant),

(id. at 153-77), all of whom testified for Alex.  For the government, I heard testimony

from Alex's trial counsel, Roland Falcon, (id. at 177-261).  All of Alex's witnesses

(including Alex himself) testified, to various extents, that Alex lived at the Praver house,

and that each would have testified at the suppression hearing to Alex's expectation of

privacy in the house had Falcon called them to do so.  Alex Campbell, Fredrick

Campbell, and Roland Falcon also testified, consistently with each other, that in the

underlying criminal case, the parties coordinated a trial strategy whereby Fredrick was

to take complete responsibility for the marijuana, while Alex proclaimed his innocence

and distanced himself from the conspiracy.  (Id. at 27, 32-36, 164-67, 198-99).  The

main conflict that emerged from the evidentiary hearing is whether (a) Alex and Falcon

made a strategic agreement, in light of their overall trial strategy, that they should focus

their motion to suppress on the UPS package, keep Alex off the stand in the

suppression hearing, and not put forth testimony before trial, or (b) Falcon ignored

requests by Alex to introduce witnesses and testimony that would have established his

expectation of privacy in the Praver house.  (Compare id. at 198-99, 201-02, 229-30, 245, 250-51 with id. at 38-39, 61-65).

Although the testimonies of Alex, his witnesses, and Falcon were consistent on some points, there were plain inconsistencies on others.  For example, as just noted, Falcon and Alex both testified that they had agreed, early in the case, on a trial strategy of "distancing" Alex from the marijuana conspiracy while Fredrick took full responsibility.  (Compare Doc. 49 at 27, 32-36 with e.g., id. at 198-99).  However, Alex testified that he disagreed with Falcon's approach to the motion to suppress, (see id. at 61-65), whereas Falcon testified that he had consulted Alex on the suppression strategy and that Alex agreed with it, (id. at 201-02, 228).  Thus, the Court must make a credibility determination to resolve the inconsistencies.

## B. Credibility Determination

Closely observing his demeanor, examining the content of his testimony, and comparing it to that of other witnesses, Alex did not impress me as someone who was always telling the truth.  For one, Alex gave testimony at the evidentiary hearing which the Court has already determined to be perjurious – and for which he received a two-offense level Guidelines enhancement for obstruction of justice.  Alex testified at the hearing that police officers did not find shipping labels and receipts in his pockets, but in his brother's.  (Doc. 49 at 52, 67).  Alex testified similarly at trial, but the Court found such testimony to be false, and the Court further found that such testimony was calculated to exculpate himself.  (See Crim. Doc. 344 at 50-52).  Although whether police discovered labels in Alex's pockets does not directly relate to whether Falcon rendered ineffective assistance, the fact that Alex gave testimony that the Court has

already found to be perjurious undermines his credibility.[6]  Alex's testimony about the circumstances surrounding the motion to suppress also bore inconsistencies with his own testimony, as well as Fredrick's and Falcon's testimony, for reasons discussed further below.  Moreover, Alex has a substantial interest in the outcome of the case, and so has an incentive to be untruthful.

For his part, Falcon's testimony appeared credible.  Observing his demeanor and examining the content of his testimony, he impressed me as someone who was telling the truth.  He has neither reason to lie nor a personal interest in the outcome of Alex's § 2255 motion.  Falcon is a member in good standing of the Florida Bar, and as such, he is an officer of the court with a duty of candor.  See Rule 4-3.3(a) of the Rules Regulating the Florida Bar ("A lawyer shall not knowingly… make a false statement of fact or law to a tribunal[.]").[7]  Except for some insignificant details[8], his memory of the case was strong.  Falcon appeared organized, and seems to have kept a record of his meetings with Alex.  (See e.g., Doc. 49 at 185-86, 189, 193, 222).  His recollection of what transpired in the case made sense.  Therefore, I adopt his account of events.

---

[6]     That is not to say that Alex's false testimony that officers did not find shipping papers in his pockets is immaterial to these proceedings.  To the contrary, the labels retrieved from Alex's pockets are relevant to the prejudice prong of the Strickland/ Kimmelman analysis, which concerns what the non-excludable evidence would have been able to prove.  As such, his testimony that officers did not find the shipping receipts in his pockets may well be calculated to influence the Court's prejudice analysis, by attempting to knock out non-excludable evidence of the quantity of drugs he was involved in trafficking.

[7]     At any stage of a case and on its own, a court may take judicial notice of a fact that cannot be reasonably disputed because it is either generally known or can be readily and accurately determined from sources whose accuracy cannot reasonably be questioned.  Fed. R. Evid. 201(b)-(d).  If a court takes judicial notice of a fact before notifying a party, the party may still be heard upon request.  Fed. R. Evid. 201(e).  Objections to a magistrate judge's report and recommendation provide an opportunity to be heard. Amadasu v. Christ Hosp., 514 F.3d 504, 508 (6th Cir. 2008).  Because Falcon's membership "in good standing" of the Florida Bar can be readily and accurately ascertained from Florida Bar records on www.floridabar.org, and the accuracy of those records cannot reasonably be questioned, I take judicial notice of those facts.

[8]     Falcon believed that police recovered over $800,000 from Fredrick's storage unit, although that figure was a little more than $500,000.  (Doc. 49 at 241).  However, this fact was not significant to the case.

As for the remaining witnesses, I do not feel the need to make individual credibility determinations.  The essence of their testimonies was that Alex lived and slept at the Praver house, that he kept clothes and personal belongings there and so forth, and that they would have testified to these facts had Falcon called them to testify at the suppression hearing.  Because the government does not dispute that Alex actually lived at the Praver house, I accept this aspect of their testimony without making credibility determinations for each witness.

## C. Findings of Fact

First, I propose finding that Alex Campbell, Roland Falcon, and Alex's codefendants and their lawyers coordinated a trial strategy whereby Fredrick would take responsibility for the marijuana, while Alex argued that he was entirely uninvolved.  (See id. at 193-95).  Alex, Fredrick, and Falcon each testified that this was their plan for trial from early on.  (Id. at 27, 32-36, 164-67, 193-95, 198-99, 245, 250-51).  Indeed, the record from the underlying criminal trial reflects that this was their strategy: Fredrick took responsibility for the drugs and denied that any of his family members had any knowledge of his operation, (Crim. Doc. 342 at 63-64, 67, 71-73), and Alex testified that he was just a college student and small business owner who had no involvement in dealing or distributing marijuana, (id. at 188-89, 192-98, 211-12, 225-30).  Alex acknowledged at the hearing that, under the circumstances then existing, this strategy benefited him.  (Doc. 49 at 33).

Second, I propose finding that Alex did, in fact, live at the Praver house. Uncontroverted evidence and testimony reflected that Alex leased the Praver house, (id. at 47, 71-72); that he had a key to the house, (id. at 19-20, 71, 100, 129, 138, 157-58);

that he slept there regularly, (id. at 71, 77); that he kept clothes and other personal possessions there, (id. at 19-20, 77, 129, 157-58); and that he could admit or exclude people from the residence, (id. at 71-72, 100, 157-58).  The government did not contradict this testimony.  Likewise, I propose that Sonia Dodd freely allowed Alex to come over to her house on Trevi Drive, although he did not have his own room there. (See id. at 138).  The government did not contradict this testimony either.

Third, notwithstanding the finding above, I find that there was conflicting evidence in the underlying case about where Alex Campbell actually lived.  When Alex was arrested, the home address listed on his driver's license, and in his booking report, was not Praver Drive but 4711 San Jose Manor Drive, Apartment Number 4.  (Id. at 45, 209).[9]  When police officers arrested him at the Praver house, Alex himself stated that he refused to tell officers where he lived, (Doc. 14 at 2), and regardless of whether he spoke to officers, he did not give the Praver residence as his home address.  (Crim. Doc. 147 at 11).[10]  Utility records also showed that an account in Alex's name had been opened at another house on Trevi Drive (although Alex speculated that perhaps his mother had been responsible for opening that account without his permission).  (Doc. 49 at 42-43).  Several other records, including utility records, a statement of deposit, and mail addressed to Alex, connected him to a house on 7910 Napo Drive in

---

[9]    Alex testified that even though he had not lived at that address since 2003, and even though he knew Florida law requires an individual to update the address on their driver's license within ten days of moving, he still had not done so six years later.  (Id. at 23).  In fact, Alex had gotten his driver's license duplicated shortly before his arrest, (id. at 45), yet he still allowed it to represent that he lived at an address where he no longer resided.

[10]    While Alex's refusal to tell officers whether he lived at the Praver house might not have been admissible against him at trial, it could have been used to impeach him at the suppression hearing had he attempted to claim he lived at the Praver house.  See United States v. Raddatz, 447 U.S. 667, 679 (1980) (Because the interests at stake in a suppression hearing are of a lesser magnitude than those in the criminal trial itself, the court may rely on hearsay and other evidence at a suppression hearing, even though that same evidence would not be admissible at trial.).

Jacksonville, Florida.  (Id. at 42-43, 44, 48-49).  Further complicating matters, none of the UPS shipping receipts that police recovered from Alex's pockets bore the Praver address as the destination.  Rather, two reflected a home on Ponce de Leon Avenue as the destination, one reflected a home on Silent Brook Trail as the destination, and the other reflected a home on Cedar Drive as the destination.  (Crim. Doc. 350 at 69-70; see also Crim. Doc. 214 at 4).  Falcon also testified that, as the motion deadline approached, there was little to prove that Alex lived on Praver Drive except for some evidence that he leased the house.  (Doc. 49 at 208-09).  Falcon recalled that during his investigation, photographs from the Praver house depicted mattresses and clothes strewn across the floors, (id. at 229-30), which also does not seem consistent with someone's nightly abode.  Indeed, when a magistrate judge issued a detention order for Alex, he noted the following: "[T]he United States offered evidence of Defendant renting a number of different residences and using various addresses for other purposes, suggesting Defendant does not have a stable residence."  (Crim. Doc. 89-2 at 2).  This theme surfaced early in the case, and it informed Falcon's decision not to have Alex testify at the suppression hearing about where he lived.  (See Doc. 49 at 244-45, 250-51).  As Falcon noted:

> The initial conversations I had with Mr. Campbell was to distance ourselves from the family business as much as possible.  Toward that end, that's the strategy that I followed.  And in our discussions it seemed to me that different addresses, especially when the Government was trying to prove that there was so much marijuana throughout the years and that this was an ongoing enterprise, I thought distancing ourselves from those places seemed to be the way to go.

(Id. at 250-51).

Fourth, I find that Falcon developed a strategy for the motion to suppress with the above constraint and the overall trial strategy in mind.  (See id. at 229-30, 245, 250-52). Falcon's decision to focus the motion to suppress on the UPS package – rather than to assert that Alex had expectations of privacy in both the Praver and Trevi houses – was not an oversight, but a strategic choice.  Falcon discussed the government's evidence with Alex, the sources of the evidence, and the pros and cons of different approaches to seeking suppression of that evidence.  (Id. at 196-98, 258-59).  As Falcon noted, "the trail [of evidence] started with [a UPS employee] taking that package off the delivery truck." (Id. at 243).  Therefore, Falcon reasoned that focusing on suppressing the UPS package was the best route, because succeeding in that would mean all the evidence discovered thereafter was fruit of a poisonous tree.  (Id. at 228, 244; see also Crim. Doc. 111 at 1-2) (arguing that all other evidence is fruit of a poisonous tree).[11]  It seems Falcon tried to finesse the issue of Alex's standing in the UPS package: he tried to prove Alex's expectation of privacy in the parcel based on having custody of it and leasing the residence to which it was addressed, see Campbell, 434 F. App'x at 809; (Crim. Doc. 147 at 14-15; Doc. 49 at 237-38), but without running the risk of Alex or his associates testifying at the suppression hearing in a manner that could expose him to impeachment later, (see id. at 210-11, 229-30, 245, 250-52).[12]  Simply put, however,

---

[11]    Because the two large packages of marijuana were recovered from the Praver residence pursuant to a search warrant, directly challenging the officers' search of the Praver house would not have suppressed the marijuana anyway.  Indeed, no defendant argued as much in their motions to suppress or their § 2255 motions, and Alex admitted that the packages would still have been admissible in his supporting memorandum.  See Doc. 2 at 11 ("Absent the excludable evidence, the government's drug quantity evidence would only have supported a verdict for possession with intent to distribute less than 100 kilograms of marijuana…."). Thus, Falcon could have reasoned that the only other way to suppress the packages of marijuana was to nip the investigation in the bud, by arguing that the initial inspection of the package at the UPS store was illegal, which is what Falcon did.

[12]    In any event, I note that Alex's motion to suppress the UPS package did not fail because he did not establish his expectation of privacy in the Praver house.  Rather, the Eleventh Circuit explained that he did

Falcon's priority was preserving the trial strategy because he believed he already had a winning plan in letting Fredrick take full responsibility, (e.g., Doc. 49 at 198-99, 250-52). Falcon did not want to jeopardize that strategy by putting on testimony at the suppression hearing. (E.g., id. at 245, 250-52). Specifically, Falcon was concerned that if he introduced testimony that Alex lived at the Praver house, he would expose Alex to impeachment about where he maintained residence, given his connection to multiple addresses – and thereby run the risk of Alex being branded a liar. (See id. at 245). Falcon stated:

> …[Y]ou got to look at the forest besides the tree. If we're going to go to trial, I don't want to put him on the stand and then have all these insinuations of different addresses, this, that and the other coming in to basically make him look like a liar; that I wanted to fight as much as I could to keep him from being branded that.
>
> So if I could portray him as a college student, singing in a band[13], there's almost a million dollars in a storage unit, all belonging to his brother, his brother's going to take basically culpability for everything. All I have to do is remove him from the family and proceed in that direction. And I thought at that time that was our best chance of a not guilty verdict. But that's what I explained and that's what we followed.

(Id.) Falcon further feared that if he highlighted the personal ties necessary to prove that Alex had an expectation of privacy in the Praver house – where police found incriminating evidence – he would be doing the opposite of distancing Alex from the marijuana conspiracy, (see Doc. 49 at 229-30, 250-51). Accordingly, Falcon

---

not have standing to suppress the parcel because Alex had not shown that he was "the sender or named addressee on the package, nor did [he] establish a connection to the named addressee or show that [he] used the name on the package as an alias." Campbell, 434 F. App'x at 809. Thus, Alex would have had to identify himself with the alias to whom the package was addressed in order to create standing, but that would effectively require Alex to accept ownership of the marijuana. Nowhere does Alex complain that his attorney was ineffective for not doing that, because that would be incompatible with Alex's plan to assert his innocence. Indeed, such an admission would undermine Alex's entire trial strategy of distancing himself from the marijuana conspiracy and letting Fredrick take full responsibility.

[13] Alex was part of a rap group with his brother and their friends, who shared a small recording studio at the house on Napo Drive. (Crim. Doc. 342 at 190-91).

deliberately decided that emphasizing Alex's connections to the Praver house at the suppression hearing might undermine his overall trial strategy.[14] Falcon believed he could achieve better results by narrowly focusing the motion to suppress on the UPS package.

Fifth, I find that Falcon investigated the possibility of having Alex's roommate, Temario Wiley, testify at the suppression hearing.  Although Falcon did not recall whether he spoke to Wiley in regard to the suppression hearing or just trial, (id. at 204), Wiley recalled that Falcon spoke to him specifically about testifying at the suppression hearing, (id. at 74).  However, Falcon made a deliberate decision not to call Wiley because (a) Falcon had concerns about Wiley's credibility, and (b) Falcon was concerned that he would say things that were contrary to their theory of the case.  (Id. at 203-05).  Indeed, Wiley himself testified that Falcon chose not to have him testify at the suppression hearing because Falcon told him it was not a "good idea."  (Id. at 74, 76).

Sixth, I find that Alex agreed with Falcon's strategy for the motion to suppress.  Falcon testified that he consulted Alex about focusing the motion on the UPS package, the risk of presenting testimony at the suppression hearing, and keeping Alex off the stand, and that Alex agreed with that approach.  (Id. at 201-02; see also id. at 210-11, 216-17).  For his part, Alex acknowledged that he accepted Falcon's advice not to testify at the suppression hearing, (id. at 39), and stated that he would have testified had he felt the need to do so, (id. at 57).[15]  Indeed, the record of the suppression

---

[14]   Falcon was aware that he could exclude testimony in the suppression hearing from being used as substantive evidence of Alex's guilt at trial, id. at 251, but he also knew that testimony from the suppression hearing could be used to impeach Alex were he to go to trial – a possibility he wanted to avoid, id. at 251-52.

[15]   Alex also stated that Falcon advised him against testifying at trial.  Id. at 57.  However, Falcon stated that the very reason he did not want Alex to testify at the suppression hearing was because he

hearing does not reflect that Alex raised any objection to not testifying, nor did Alex

seek to add anything to the testimony presented.  (See Crim. Doc. 135, generally).

Evidently then, Alex was satisfied that his testimony was unnecessary.

Finally, I find it likely that Alex wanted Falcon to prove his expectation of privacy

in the Praver and Trevi houses only after the magistrate judge released his Report and

Recommendation, at which point Falcon could no longer raise new arguments.  I find it

likely that the Report caused Alex to realize, with hindsight, that he could have

suppressed some of the papers seized from those houses had he and Falcon not

focused on the UPS package.  Accordingly, Alex began to insist that Falcon directly

challenge the searches of the two houses, (see id. at 246, 259-60), whereas he had not

pressed that issue before the Report and Recommendation came out, (id. at 260).

Falcon obliged by moving to adopt the codefendants' motions to suppress, (see Crim.

Doc. 194).  However, Alex likely did not instruct Falcon to focus on the searches of the

Praver and Trevi houses until after he reviewed the Report.  (See id. at 221, 246, 259-

60).  Falcon recalled that he and Alex had agreed, at the time he filed the motion to

suppress, that focusing on the UPS package was their best route.  (See e.g., id. at 228).

Alex, of course, testified that he wanted Falcon to directly challenge the searches

of the Praver and Trevi houses all along, and that he had always been displeased with

Falcon's motion for not doing so.  (Id. at 38-39, 61).  Alex denied that his complaint

about the motion to suppress was a product of hindsight, spurred by the magistrate

judge's Report.  (Id. at 64).  However, Alex's account is unsteady and lacks credibility.

For one, Alex testified that he had always wanted Falcon to challenge the search of the

---

needed him to testify at trial, and did not want his suppression testimony to be used to impeach his trial
testimony.  (Id. at 252).  Having found Falcon to be the more credible witness, I find his account to be true.

Praver house because he thought doing so would result in suppressing <u>everything</u>.  (<u>Id.</u> at 38-39).  Yet in his supporting memorandum, Alex acknowledged that the marijuana that officers physically recovered would remain admissible even if he <u>had</u> established standing in the Praver house.  (Doc. 2 at 11) ("Absent the excludable evidence, the government's drug quantity evidence would only have supported a verdict for possession with intent to distribute less than 100 kilograms of marijuana….").[16] Because the marijuana itself was arguably the most incriminating piece of evidence against Alex, his testimony that "his main goal was attacking the search at Praver," (Doc. 49 at 39), does not make sense in light of his concession that doing so would not have excluded the marijuana anyway.  Rather, it rings of hindsight in the wake of the magistrate judge's finding that there were some papers unlawfully seized from the two houses.

Alex confirmed that Falcon gave him a copy of the motion to suppress before the suppression hearing, (<u>id.</u> at 50), and Alex claimed he was disappointed with it, (<u>id.</u> at 61).  Yet Alex never complained or raised any objection to the Court, nor did he ever ask for a new lawyer, (<u>id.</u> at 62-63) – even as his mother and brother did the same whenever they were dissatisfied with their attorneys, (<u>see</u> <u>id.</u> at 152-53, 159-60).  Alex's explanation for not complaining to the Court, however, was that he "figured that [Falcon] did do it," (<u>id.</u> at 64), referring to challenging the search of the Praver house.  This explanation is inconsistent with his claim that he had been dissatisfied with Falcon <u>all</u>

---

[16]     Indeed, even if Falcon <u>had</u> established Alex's expectation of privacy in the Praver house, that would not have excluded the marijuana.  The magistrate judge's report and recommendation (Crim. Doc. 147) found there was no unlawful search other than the officers' examination of certain lease agreements and other papers.  Thus, establishing Alex's expectation of privacy in the Praver house would have done nothing to exclude the marijuana, which officers retrieved pursuant to a warrant specifically authorizing them to find and seize marijuana.

along for not attacking the search of the Praver house. (See id. at 61-65). Moreover, in an affidavit submitted along with his § 2255 motion, Alex averred that Falcon told him, point blank, that he would not file a motion to suppress that directly challenged the search of the residences. (See Affidavit A-1 at ¶ 8). Thus, Alex's explanation that he did not complain to the Court only because he "figured that [Falcon] did do it" lacks credibility.

That Alex never requested a new attorney – and even retained Falcon through trial (see Crim. Doc. 338-343) and sentencing (see Crim. Doc. 344) – reinforces Falcon's testimony that he and Alex were in agreement on strategy. Alex almost certainly knew he could request a new lawyer if he was actually dissatisfied, because his mother and brother each succeeded in obtaining new lawyers for themselves, and furthermore, Fredrick testified that Alex knew about his experiences with changing lawyers. (See id. at 152-53, 159-60).[17] Fredrick confirmed that Alex knew about a "situation" he had with his first lawyer, whom Fredrick sought to replace both shortly before and after the suppression hearing. (See id. at 159-60; see also Crim. Doc. 124, 134, 183-186). Significantly, however, Fredrick testified: "Well, [Alex]… knew that I was going through the situation with my attorney. I mean, did I discuss it as far as with his attorney, I don't – I mean at that particular time I don't think he had any problems." (Doc. 49 at 160) (emphasis added).[18] This testimony corroborates Falcon's testimony that he and Alex were in agreement on a strategy.

---

[17]    Dodd recalled changing lawyers two or three times upon writing the judge to complain. Id. at 152-53. Fredrick Campbell recalled twice informing his lawyer that he wanted a new attorney because of "irreconcilable differences." Id. at 159-60.

[18]    Notably, Fredrick testified that leading up to their trial, he and Alex were housed together, and they regularly discussed their cases with each other. See id. at 155-56, 162-64, 174-75. Thus, if Alex was truly having a disagreement with his lawyer, Fredrick would have been in a good position to know about it given that they routinely discussed their proceedings.

In summary, therefore, I find that Alex and his trial counsel, Roland Falcon, discussed and agreed upon a strategy for approaching the trial – which was essentially for Alex to proclaim his innocence.  Alex and Falcon agreed to try to distance themselves from Fredrick and anything related to the marijuana conspiracy because Fredrick planned to take exclusive responsibility.  Then they constructed a strategy for the motion to suppress that they felt would not compromise their overall strategy.  Alex and Falcon agreed that focusing on the UPS package was the most effective approach, because succeeding in that endeavor would exclude the most damaging evidence and render everything else fruit of a poisonous tree.  To challenge the search of the Praver house, on the other hand, would not have excluded the packages of marijuana and would have required Falcon to establish that Alex had an expectation of privacy therein.  That, in turn, would require volunteering testimony that Alex lived at the Praver house, which Falcon feared would expose Alex to impeachment concerning his connection to numerous other addresses.  Given the nature of the charges, Falcon did not want to voluntarily open up the issue of Alex's relationship to multiple residences, which could be used to impeach Alex when he testified at trial.  (Id. at 250-52).  Additionally, Falcon intimated that he intentionally did not want to show that Alex lived at the Praver house because, with mattresses and clothes scattered about the floors, he simply thought it better to distance Alex from the place.  (See id. at 229-30).  As such, Falcon's decision to focus only on suppressing the UPS package was a deliberate choice designed to avoid exposing Alex to impeachment.

IV.     **Recommended Disposition**

A.  **The First <u>Kimmelman</u> Prong: Whether Alex Campbell Had a Meritorious Fourth Amendment Claim**

The first prong of the analysis is whether Alex had a meritorious Fourth

Amendment claim.  <u>Kimmelman v. Morrison</u>, 477 U.S. 365, 375 (1986).  This case

comes before me with the benefit of a prior Order and Report and Recommendation,

which found that police officers exceeded the scope of their search warrant when they

seized certain papers from the Praver and Trevi houses.  (Crim. Doc. 147 at 28-35;

Crim. Doc. 200, Order Adopting Report and Recommendation).  The Report also

concluded that the evidence discovered from other locations, as a result of the seizure

of lease agreements and other papers, would be excludable as to anyone who had

standing in the Praver or Trevi houses.  (Crim. Doc. 147 at 31-32).  Therefore, whether

Alex had a meritorious Fourth Amendment claim pares down to whether he had a

reasonable expectation of privacy in either house.

Whether an individual has a reasonable expectation of privacy in a residence

depends on several factors.  Having a long-term rental or lease agreement for a

residence is one.  <u>United States v. Ramos</u>, 12 F.3d 1019, 1023 (11th Cir. 1994).  "A

defendant also may establish standing by demonstrating an unrestricted right of

occupancy or custody and control of the premises searched; ownership is not required,

but mere presence or even possession of a key is insufficient."  <u>United States v.</u>

<u>Merricks</u>, 572 F. App'x 753, 757 (11th Cir. 2014) (citing <u>United States v. Sarda–</u>

<u>Villa</u>, 760 F.2d 1232, 1236 (11th Cir.1985)).  As noted, the uncontradicted testimony

reflected that Alex leased the Praver house, lived and slept there daily, exercised

dominion and control over it, and maintained his own room and personal possessions

there.  Alex therefore had a reasonable expectation of privacy in the Praver house.  As

such, he had standing to suppress the papers seized from there, and thus had a

meritorious Fourth Amendment claim as to those papers.

Whether Alex had an expectation of privacy in his mother's house on Trevi Drive

is less clear.  Alex admitted he did not live at the Trevi house.  (E.g., Doc. 49 at 42).

Sonia Dodd and Alex simply testified that he was free to come to the house whenever

he wanted, and that he occasionally spent the night there.  However, Alex provided no

testimony specifying the frequency with which he slept over at the Trevi house.  Indeed,

Temario Wiley testified that Alex spent nearly every night at the Praver house instead.

(Id. at 77).  Alex also has never claimed he was an overnight guest at the Trevi house

preceding the search.  Dodd testified that when Alex did sleep over at her house, he

slept on her bed, in her daughter's room, or on the couch.  (Id. at 138).  Alex did not

have his own room at the Trevi house, and according to Dodd, he primarily lived on

Praver Drive.  (Id.)  Such testimony suggests that Alex lacked his own private space at

the Trevi house.  Although Alex testified that he kept some personal belongings at the

Trevi house, he also testified that he kept most of his personal belongings at the Praver

house.  (Id. at 19-20).  Alex testified that he had a key to his mother's house, but this

fact does not establish he had standing either.  United States v. Rackley, 742 F.2d

1266, 1270 (11th Cir. 1984).  Many people have keys to their family members' houses,

but that does not suffice to give them all an expectation of privacy in the homes of all of

their family members.  Furthermore, "the mere legitimate presence on the searched

premises by invitation or otherwise, is insufficient in itself to create a protectible

expectation.  A defendant must also establish a legitimate expectation of privacy in the

particular area searched in order for a fourth amendment challenge to be allowed."

United States v. Meyer, 656 F.2d 979, 981 (5th Cir. 1981) (emphasis added) (citations

omitted).  Thus, the fact that Dodd generally allowed Alex to come over to the Trevi

house does not mean he had an expectation of privacy in the particular areas of the

house where officers retrieved certain papers, and he provided no evidence to that end.

Overall, the testimony from the evidentiary hearing, even in conjunction with the

witnesses' affidavits, (see Affidavits A-3, G-1), was insufficient to determine whether

Alex had a reasonable expectation of privacy in the specific areas of the Trevi house

where officers unlawfully seized evidence.  Rather, it appears that Alex is speciously

trying to establish an expectation of privacy in any house where officers discovered

evidence.  I therefore recommend against finding that Alex had a reasonable

expectation of privacy in Dodd's house on Trevi Drive, or at least not in the specific

areas from which officers retrieved lease agreements and other evidence.

I emphasize that Alex's meritorious Fourth Amendment claim is limited.  As the

Report on Alex's motion to suppress recommended (Crim. Doc. 147), the only unlawful

search that occurred was the seizure of lease agreements and other papers that were

laying around the Praver and Trevi houses.[19]  The UPS employee's inspection of the

first package of marijuana – the first in a sequence of searches yielding incriminating

evidence – was private conduct rather than government action, and so did not implicate

the Fourth Amendment in the first place.  (Accord id. at 21-23).  As such, proving Alex's

expectation of privacy would not have created a meritorious Fourth Amendment claim in

---

[19]    The Report did find that officers also unlawfully seized a gold medallion and $5,985 in cash from
the Praver house, id. at 31, but these items were not the subject of the instant § 2255 motion.  Even if
they were, it is highly unlikely that these two items made any significant impact at trial, and thus excluding
them would not likely have changed the jury's verdict.

the UPS package anyway.  (Id. at 22-23).  The results of the UPS employee's inspection, in turn, led to a warrant that specifically authorized officers to search the Praver house for marijuana.  The subsequent seizure of two large packages of marijuana (pursuant to that very search warrant), and the seizure of several firearms that were in plain view, were therefore lawful as well.  (Accord id. at 23-28).[20] Moreover, the shipping receipts and 95 grams of marijuana seized from Alex's person resulted from a search incident to a lawful arrest.  (See id. at 11).[21]  Thus, all of these pieces of evidence would have been admissible against Alex anyway, even if Falcon had established his standing in the Praver house.  Indeed, Alex admitted in his supporting memorandum at least that the marijuana which officers physically recovered would still have been admissible.  (See Doc. 2 at 11).

Thus, Alex only had a meritorious Fourth Amendment claim as to the lease agreements and storage unit rental agreements that officers seized from the Praver house, which were outside the scope of the search warrant.  (Accord Crim. Doc. 147 at 23-31).  However, for the reasons discussed below regarding Kimmelman's prejudice prong, even if this evidence and all of its fruits had been suppressed, it would not have changed the final verdict or sentence.

---

[20]     The parties have not disputed that, once the search warrant issued, police were authorized to search for and seize the packages of marijuana from the vehicle Alex was driving.
[21]     Of course, a lawful search incident to arrest requires that the arrest itself be lawful, i.e. supported by a warrant, or by probable cause and an exception to the warrant requirement.  However, Alex Campbell has never, either here or in the underlying criminal case, asserted that police lacked probable cause to arrest him.

### B. The Second Kimmelman Prong:  Whether Counsel's Performance Was Deficient

The conclusion that Alex had a meritorious Fourth Amendment argument does not prove that trial counsel performed unreasonably.  See Kimmelman, 477 U.S. at 382. The Court must still apply "the rigorous standard which Strickland [v. Washington, 466 U.S. 668 (1984),] erected for ineffective assistance claims[.]"  Kimmelman, 477 U.S. at 381.  "The burden of persuasion is on a petitioner to prove, by a preponderance of competent evidence, that counsel's performance was unreasonable."  Chandler v. United States, 218 F.3d 1305, 1313 (11th Cir. 2000).  Because "[j]udicial scrutiny of counsel's performance must be highly deferential," Strickland, 466 U.S. at 689, the petitioner must show that particular acts or omissions of counsel were outside the wide range of professionally competent assistance, id. at 690.  In conducting its review, the Court must evaluate counsel's performance in the context of the circumstances as they existed at the time, and not allow hindsight to distort its judgment.  Id. at 689.

In evaluating counsel's effectiveness, several principles serve as a guide: (1) a strong presumption exists that counsel's performance might be considered sound trial strategy; (2) strategic choices made after a thorough investigation are virtually unchallengeable, and (3) those strategic choices made after less than complete investigation are reasonable to the extent that reasonable professional judgments support the limitations on investigation.  Id. at 689–91.  "[N]o absolute duty exists to investigate particular facts or a certain line of defense."  Chandler, 218 F.3d at 1317. Nor can counsel be adjudged incompetent for performing in a certain way in a case, so long as the approach taken "might be considered sound trial strategy."  Darden v. Wainwright, 477 U.S. 168, 186 (1986).  "[S]trategic decisions are ones that, among

other things, involve a weighing of competing positive and negative consequences that may flow to the defendant from a particular choice." Green v. Nelson, 595 F.3d 1245, 1251 (11th Cir. 2010). "For example, counsel's reliance on particular lines of defense to the exclusion of others – whether or not he investigated those other defenses – is a matter of strategy and is not ineffective unless the petitioner can prove the chosen course, in itself, was unreasonable." Chandler, 218 F.3d at 1318 (emphasis added). Additionally, "[w]hich witnesses, if any, to call, and when to call them, is the epitome of a strategic decision, and it is one that we will seldom, if ever, second guess.'" Evans v. Sec'y, Fla. Dep't of Corr., 699 F.3d 1249, 1268 (11th Cir.2012) (quoting Waters v. Thomas, 46 F.3d 1506, 1512 (11th Cir.1995) (en banc )).

Courts must "indulge [the] strong presumption" not only that counsel's performance was reasonable, but also that counsel "made all significant decisions in the exercise of reasonable professional judgment." Strickland, 466 U.S. at 689-90. The purpose of ineffectiveness review is not to grade counsel's performance, for the test is not what the best lawyers would have done, or what is possible, prudent, or appropriate, but only what is constitutionally compelled. Chandler, 218 F.3d at 1313 (citations omitted). "[I]t does not follow that any counsel who takes an approach [that the Court] would not have chosen is guilty of rendering ineffective assistance." Waters, 46 F.3d at 1522. "Representation is an art, and an act or omission that is unprofessional in one case may be sound or even brilliant in another." Strickland, 466 U.S. at 693.

Furthermore, we must not only give counsel the benefit of the doubt, but must also "affirmatively entertain the range of possible reasons [Alex's] counsel may have had for proceeding as he did." Cullen v. Pinholster, 131 S.Ct. 1388, 1407 (2011)

33

(internal quotation marks omitted).  "An ambiguous or silent record is not sufficient to disprove the strong and continuing presumption [in favor of competence.]"  Chandler, 218 F.3d at 1314 n. 15.  And while no attorney is above scrutiny, "[w]hen courts are examining the performance of an experienced trial counsel, the presumption that his conduct was reasonable is even stronger."  Id. at 1316 & n. 18 (citing Provenzano v. Singletary, 148 F.3d 1327, 1332 (11th Cir. 1998); Burger v. Kemp, 483 U.S. 776, 779-80 (1987)).[22]

In this case, the record reflects that Falcon and Alex had agreed on an overall trial strategy whereby Alex was to completely distance himself from the drug conspiracy, while Fredrick Campbell took full responsibility.  Falcon developed the strategy after convening with the codefendants' lawyers and learning that Fredrick planned to admit to the marijuana, but only to dispute the weight involved.  (Doc. 49 at 193-94).  Falcon believed that because Fredrick was going to take exclusive responsibility for the narcotics and testify that Alex was uninvolved, this provided the best chance of getting Alex acquitted.  (Id. at 198-99).

Falcon's testimony, which I credit, was that he consulted Alex about the government's evidence, its sources, and the "pros and cons" of different approaches to seeking suppression.  (Id. at 197-98, 258-59).  Falcon considered the marijuana packages recovered from the car Alex was driving to be among the pieces of evidence

---

[22]      Falcon is a member of the bar in both Texas and Florida.  (Doc. 49 at 179-80).  He has practiced law in Florida since February 1998.  (Id. at 180).  Falcon worked as a public defender from 1998 to December 2001, and during that time handled between 3,200 and 3,300 cases in total.  (See id. at 181-82).  Of those, Falcon estimated he tried 50 cases as a public defender.  (Id. at 182).  Since 2001, Falcon has been in private practice, where his concentrations have been criminal law, family law, and business law.  (Id. at 180).  Since late 2001, Falcon has been an attorney on the CJA panel for the Middle District of Florida, and in that capacity he has handled 250 to 350 criminal cases in federal court.  (See id. at 181-82).  Of the federal criminal cases Falcon has handled, he estimated that he has taken seven or eight to trial.  (Id. at 182).

most damaging to their theory.  (Id. at 198-99).  But because police recovered those

packages from the Praver house pursuant to a warrant specifically authorizing them to

seize marijuana, challenging the search of the house would not have excluded the

packages anyway.  Indeed, Alex concedes as much.  (See Doc. 2 at 11).  Rather, to

exclude the packages, Falcon had to find something earlier along the trail, such as the

inspection of the package at the UPS store (which preceded the warrant), and argue

that such a search was unlawful.  As Falcon observed, "the trail started with Mr. Brown

[the UPS employee who searched the package] taking that package off the delivery

truck."  (Doc. 49 at 243).  Since the fruits of an unlawful search could not have furnished

probable cause for a warrant, United States v. Palazzo, 488 F.2d 942, 947 (5th Cir.

1974), and the results of the UPS inspection formed the basis of the warrant to search

the Praver house, (see Crim. Doc. 147 at 3-4, 8), Falcon believed that successfully

attacking the UPS inspection could render the marijuana and any other evidence

suppressible.  Falcon's testimony and the motion to suppress reflect that these were his

thoughts.  (Doc. 49 at 228, 244; see also Crim. Doc. 111 at 1-2) (arguing that all

evidence subsequently acquired was fruit of a poisonous tree).  Moreover, there was

testimony at the suppression hearing that the UPS employee had extensively

cooperated with JSO on drug interdiction, both in the past and in Alex's case.  (See

Crim. Doc. 147 at 2-4, 5-7).  Thus, although Falcon's argument – that the employee was

functionally a government agent when he searched the package without probable cause

– ultimately failed, (see id. at 21-23), it was not manifestly unreasonable.[23]  Falcon

---

[23]    Nor was it objectively unreasonable for Falcon to attempt to establish Alex's expectation of privacy in the UPS package without his testimony, by relying only on his possession of the package and the fact that it was mailed to the residence he leased.  The Eleventh Circuit agreed that possession is a factor in determining whether one has an expectation of privacy in an object, but also pointed out that possession

made an informed decision that focusing his suppression efforts on the inspection of the UPS package, which was the germ of the entire investigation, held the promise of excluding the most damaging evidence.

Of course, Falcon's motion to suppress could have challenged both the search of the UPS package <u>and</u> the search of the Praver house.  However, an attorney need not raise every plausible argument or line of defense in order to provide effective assistance.  <u>Chandler</u>, 218 F.3d at 1319.  Sometimes stacking arguments can hurt, and "[g]ood advocacy requires 'winnowing out' some arguments… to stress others."  <u>Id.</u>  As challenging the search of the Praver house would not have excluded the marijuana anyway, Falcon could reasonably have chosen to forego other arguments in order to focus his efforts on addressing the search of the UPS package.

Alex's chief complaint is that Falcon did not call him, or certain other witnesses, to testify at the suppression hearing to facts that would have demonstrated his expectation of privacy in the Praver house.  However, Falcon's testimony also indicates that he made a strategic choice not to volunteer testimony from Alex, or his associates, that he lived on Praver Drive.  Falcon feared that doing so would open Alex up to impeachment about his connections to multiple residences.  In order to prevent Alex from being branded as a liar, so as not to compromise the overall trial strategy, Falcon chose to avoid the risk of presenting testimony at the suppression hearing.  (<u>See</u>, <u>e.g.</u>, Doc. 49 at 245).  As noted, Falcon believed he already had a promising strategy in

---

alone is insufficient.  <u>Campbell</u>, 434 F. App'x at 809.  Nonetheless, there was no single authority on point at that time that stated that possession of a parcel, <u>in combination with</u> leasing or owning the address to which a parcel is mailed, would be insufficient to establish an expectation of privacy.  Thus, Falcon could rationally have believed he could establish Alex's expectation of privacy in the UPS package based on two factors that could be demonstrated without putting Alex on the stand.

leaning on Fredrick's acceptance of complete responsibility to distance Alex from the conspiracy.  In an abundance of caution, Falcon decided to prioritize that strategy over putting Alex or his associates on the stand at the suppression hearing, which Falcon feared could give the prosecution material for impeachment.[24]  "[C]ounsel's reliance on particular lines of defense," such as Fredrick's admission of responsibility, "to the exclusion of others – whether or not he investigated those other defenses – is a matter of strategy and is not ineffective unless the petitioner can prove the chosen course, in itself, was unreasonable."  Chandler, 218 F.3d at 1318 (emphasis added).  Therefore, the fact that Falcon decided not to produce testimony at the suppression hearing, so as not to compromise the trial strategy, is ineffective only if Alex could show that the trial strategy was itself unreasonable.  Alex simply has not shown that it was objectively unreasonable to (a) rely on Fredrick's anticipated testimony to exculpate Alex, and (b) focus the motion to suppress on the UPS package rather than do anything that could jeopardize the trial strategy.[25]  Indeed, Alex acknowledged that that strategy was beneficial to him.  (Doc. 49 at 33).

Additionally, Falcon's decision on whether or not to call witnesses at the suppression hearing could be considered strategic.  "Which witnesses, if any, to call, and when to call them, is the epitome of a strategic decision, and it is one that we will seldom, if ever, second guess.'"  Evans, 699 F.3d at 1268 (quoting Waters, 46 F.3d at 1512).  Falcon, as noted, kept Alex off the stand at the suppression hearing in order to

---

[24]    I note again that Falcon understood he could exclude evidence introduced at the suppression hearing from being used at trial as substantive evidence of Alex's guilt.  (Id. at 251-52).  However, Falcon also understood that evidence introduced at the suppression hearing could be used to impeach Alex at trial.  (Id.)

[25]    In addition to his concerns about exposing Alex to impeachment, Falcon testified that there was little to show that Alex lived on Praver Drive, other than evidence that he leased the residence.  (Doc. 49 at 208).

protect him from impeachment. (See Doc. 49 at 201-02, 245, 250-52). Alex conceded

that he agreed with Falcon's advice against testifying at the hearing, (id. at 39), and

stated that he would have testified had he felt the need to do so, (id. at 56). Falcon

investigated the possibility of having Temario Wiley – Alex's roommate – testify, but he

chose not to do so because he was concerned about Wiley's credibility and what he

might say. (Id. at 203-05). Falcon also recalled that the codefendants' lawyers would

not have allowed them to testify at the suppression hearing, (id. at 206), so that ruled

out the possibility of Sonia Dodd, Fredrick Campbell, or Branddie Campbell testifying to

Alex's expectation of privacy in the Praver or Trevi houses. Of the people whom Alex

claims Falcon should have called at the suppression hearing, that leaves only Jerry

Campbell, Brandon Reddick, and Charika Pugh. Although Jerry Campbell stated before

me that he would have testified that Alex had an expectation of privacy in the Praver

house, his ability to testify to Alex's connections to the Praver residence was weak, see

(id. at 112-13), and the Court could credit a decision not to call him at the suppression

hearing as professionally reasonable. Likewise, Brandon Reddick's memory (or if not

his memory, his credibility) was not impressive. For example, Reddick denied that he

ever received or signed an affidavit in support of Alex's § 2255 motion, (id. at 129-30,

132), until the government confronted him with his affidavit, (id. at 132-33; see also

Affidavit D-1).[26] Thus, Falcon could be given the benefit of the doubt for not calling

Reddick as a witness in the suppression hearing. Charika Pugh testified that she knew

Alex lived at the Praver house because she occasionally spent nights and weekends

over there, (id. at 99-100), but she also testified that she was 16 years old at the time,

---

[26]   I also note that Brandon Reddick was arrested in August 2009, the same month as Alex's suppression hearing, for selling crack cocaine and ecstasy. (Id. at 131).

(id. at 102).  Trial counsel could reasonably have decided that she might be an unreliable witness, and that the fact that Alex allowed an underage female to spend nights and weekends at his house could damage him.  Therefore, Falcon's decision to call no witnesses at the suppression hearing could be credited as professionally reasonable.

The fact that counsel's chosen strategy did not succeed in the end does not establish that he rendered ineffective assistance.  Chandler, 218 F.3d at 1314.  Nor does the possibility that other lawyers might have taken a different approach mean that counsel performed deficiently.  Falcon researched the government's discovery, the sources of its evidence, and consulted Alex about the best strategy for trial and the suppression hearing.  (Doc. 49 at 196-97, 258-59).  Falcon testified that he and Alex agreed that the best approach to suppression, in light of their trial strategy, was to keep Alex off the stand before trial and focus on the UPS package.  (Id. at 201-02; see also id. at 210-11, 216-17, 228).  This choice was not the result of ignorance or oversight, but a deliberate one calculated not to compromise the overall strategy of distancing Alex from his codefendants and the marijuana conspiracy.  Because I cannot say that this approach was manifestly unreasonable, or the product of an unreasonably abbreviated investigation, I do not recommend finding that Falcon performed unreasonably.

### C.  The Third Kimmelman Prong:  Whether Campbell's Verdict Would Have Been Different Absent the Excludable Evidence

Finally, even if counsel had performed deficiently, Alex would have to show that counsel's performance prejudiced him.  Kimmelman, 477 U.S. at 375.  Prejudice is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different.  Strickland, 466 U.S. at 694.  In the context of a motion to

suppress, the petitioner must show that the verdict and sentence would have been different absent the excludable evidence. Kimmelman, 477 U.S. at 375. The likelihood of a different result must be substantial, not just conceivable. Harrington v. Richter, 562 U.S. 86, 112 (2011). The petitioner still bears the burden of proving prejudice. See Johnson v. Alabama, 256 F.3d 1156, 1176 (11th Cir.2001).

Notably, even where a Fourth Amendment violation has occurred, the exclusionary remedy does not apply to the sentencing phase or to the Court's calculation of a defendant's Guidelines range. United States v. Lynch, 934 F.2d 1226, 1234-37 (11th Cir. 1991). Thus, evidence that has been suppressed may still be used to calculate a defendant's Guidelines offense level and sentence. Id. at 1236-37. This rule has implications for the prejudice prong of ineffective assistance claims brought under Kimmelman. Where there is sufficient non-excludable evidence to sustain the petitioner's conviction, the petitioner does not establish prejudice merely because excludable evidence was used to enhance his advisory Guidelines sentence. United States v. Cox, 59 F. App'x 437, 438-39 (2d Cir. 2003).

Although the jury convicted Alex of trafficking more than 1,000 kilograms of marijuana, there was still sufficient, non-excludable evidence to convict him of trafficking in 100 kilograms or more under 21 U.S.C. § 841(b)(1)(B)(vii), which carries a maximum sentence that still encompasses Alex's term of imprisonment. Alex acknowledged that even if Falcon had established his expectation of privacy in the Praver house, the two 50-pound bags of marijuana recovered from the backseat of the car he was driving would have been admissible. (See Doc. 2 at 11). That concession is consistent with this Court's previous determination that the only unlawful search that occurred was of

various papers lying around the Praver and Trevi houses.  (See Crim. Doc. 147 at 23-31; Crim. Doc. 200).[27]  Additionally, the UPS shipping receipts seized from Alex's pockets incident to his arrest, which reflected shipments of 61 pounds, 59.7 pounds, 60.2 pounds, and 50.8 pounds, would have also remained admissible.[28]  Even assuming, in the light most favorable to Alex, that two of the receipts accounted for the two packages of marijuana retrieved from the vehicle, the admissible evidence would still have established a total weight of 231.7 pounds, or about 105 kilograms.[29]  That is sufficient to sustain a conviction for trafficking more than 100 kilograms under § 841(b)(1)(B)(vii).  Such a conviction carries a minimum sentence of five years and a maximum term of imprisonment of 40 years.  See 21 U.S.C. § 841(b)(1)(B).  The Court sentenced Alex to 135 months in prison on the drug charge.  (Crim. Doc. 323 at 2).  Thus, not only was there sufficient, non-excludable evidence to sustain Alex's conviction, but his sentence was still within the statutory maximum for an offense that the admissible evidence was sufficient to prove he committed.

Alex's 135 month sentence was founded as well on a Guidelines base offense level of 32, for trafficking more than 1,000 kilograms of marijuana.  See U.S.S.G. § 2D1.1(c)(4) (2010).[30]  The non-excludable evidence would not have supported this weight.  Rather, to prove that 1,000 kilograms or more were involved, the government relied on shipping receipts recovered as a result of the unlawful inspection of

---

[27]     Likewise, the 95 grams of marijuana found on Alex would also have been admissible.

[28]     Considering that the jury found marijuana and shipping receipts convincing enough to prove that more than 1,000 kilograms of marijuana was involved, there is not a reasonable probability that the jury would not have considered the receipts seized from Alex's pockets enough to prove the quantity of marijuana for which he was responsible.

[29]     One pound is the equivalent of 0.4535923 kilograms.  http://www.metric-conversions.org/weight/pounds-to-kilograms.htm

[30]     In fact, the Court sentenced Alex below his advisory Guidelines range.  (Crim. Doc. 344 at 96).

documents at the Praver house (e.g., shipping receipts from Storage Unit 2002, reflecting over 2,000 pounds of shipments).  However, even if Falcon had established Alex's standing in the Praver house and suppressed the documents and their fruits (i.e., boxes of shipping receipts), the government could still have used this evidence to establish the drug quantity for sentencing purposes.  That is because the exclusionary remedy does not extend to the sentencing phase of a criminal proceeding.  Lynch, 934 F.2d at 1237.  Moreover, the Eleventh Circuit has already held in this case that the government adequately proved the drug quantity insofar as Alex's sentence was concerned.  Campbell, 434 F. App'x at 811.  Considering that none of the evidence the government relied on to establish the drug quantity would have been excluded – for sentencing purposes – even had Falcon suppressed it, the outcome of Alex's sentencing hearing would not have been different either.

The jury also convicted Alex for possessing a firearm in furtherance of a drug crime.  Law enforcement entered the Praver house pursuant to a warrant to search for marijuana, and found firearms in plain view.  (Crim. Doc. 147 at 28).  There has been no contention that the seizure of the firearms was unlawful, or that they would have been suppressed if Alex had established standing in the Praver house.  Accordingly, even if Falcon had established Alex's expectation of privacy in the Praver house, his conviction and sentence for the firearms would not have been different.

Based on the foregoing, I find that Alex has not established prejudice.  Even if Falcon did perform unreasonably, and even if Falcon had established Alex's expectation of privacy in the Praver house, there was still sufficient, non-excludable evidence to support Alex's conviction, and to support the sentence he ultimately received.  There is

not a reasonable probability that Alex would not have been convicted, or that his sentence would be any lower, even if Falcon had shown that Alex had an expectation of privacy in the Praver residence.

## V.      Conclusion

If Falcon's testimony is credited, he conducted a reasonably thorough investigation of Alex's case, and in consultation with Alex, made a strategic decision to focus the motion to suppress on the UPS package.  Thus, in response to the Court's request that I conduct an inquiry consistent with <u>Kimmelman v. Morrison</u>, 477 U.S. 365, I recommend the following: (1) Alex Campbell had a reasonable expectation of privacy in the Praver house, and thus had a meritorious Fourth Amendment claim as to the papers that police officers examined there; but (2) trial counsel, Roland Falcon, did not perform unreasonably by focusing Alex's motion to suppress on the antecedent search of the UPS package, rather than proving Alex's expectation of privacy in the Praver house; and (3) even if Alex had demonstrated his expectation of privacy in the Praver house, there is not a reasonable probability that he would not have been convicted or that his sentence would be any lower.  I therefore recommend that Judge Howard deny Alex Campbell's § 2255 motion (Doc. 1).

**DONE AND ENTERED** at Jacksonville, Florida this 24th day of April, 2015.

_____
MONTE C. RICHARDSON
United States Magistrate Judge

Copies to:

The Honorable Marcia Morales Howard
United States District Judge

Counsel of Record

Petitioner Alex Lee Campbell